You may be seated. Our next case of the afternoon is in re on marriage of Conour to the appellant Mr. Hopp and the appellee Ms. Gordon. You may proceed. As I always introduce myself, I'm Richard W. Hopp. I'm the attorney for Jeffrey Scott Conour. He's the appellant. He was also the defendant in the original case. In filing this appeal, one of our main concerns was the issue of maintenance. And in that, one of the main concerns was voluntary underemployment. With respect to that, I have always understood that an individual had to improve their situation, had a duty to go out and do that, seek employment, upgrade their job skills, and obtain employment as best that they could. Now, in this case, our position is that that was not done by Ms. Conour. And when we look at that, I have quoted within my brief even a statement by the trial judge where he said basically that it is, and I'm paraphrasing, it's apparent that she has done absolutely nothing to upgrade her job skills and education. And he prefaced that with beating a dead horse, which was indicative of the fact that maybe we asked too many questions about her already. We had an agreement by that, by Ms. Gordon, that that was the case. Now, in the briefs, I found it interesting when we addressed this issue because I, and I will confess that I didn't pick up on this, I went off the transcript. And off the transcript, the testimony by Ms. Conour is that she had taken a job with Advanced Eye Care in 2012, somewhere around August, but she had quit that in February of 2013. Now, during that period of time, they had a minor child who was in high school, senior in high school. She was also working 20 to 25 hours for the business that Mr. Conour operated. But, so she was working 20 hours plus 20 to 25 at another job, 40 to 45 hours. I read the transcript and I quoted it in my statement of facts that she left that position and according to her testimony in February of 2013, Ms. Gordon correctly stated, and I went back and checked it, of course, that the W-2 forms for her client indicate that not only did she not leave that job in 2013, but she was working at it still into 2016. She said she had picked up on the leaving the job in February 2016, but if you look at the amount earned on a part-time job, there's no way that she would do that. So I'm guessing, I'm figuring it was much later than that. But in any event, then the argument is made that if you, that in Ms. Gordon's brief, page 5, that she could not start looking for a job, getting an education due to the fact that she was reliant upon the support order, which I think we've described adequately in the statement of facts and in the arguments, that she had to seek employment and did not have the economic benefit. Really, the simple answer to that is no. She was actually working a part-time job with Advanced Eye Care and also, and that's a part-time job, during the morning hours and was receiving the support from Mr. Conour. There's also an indication, and it's stated in Ms. Conour's brief, that she did not start seeking full-time employment until she lost the Advanced Eye Care job. With the W-2 form, she didn't start looking for a full-time job until sometime in 2016. Now, she picked up the job at the Ruffin In It as a receptionist, and she kept that job. Again, a part-time job, she was earning $11.50 an hour. But again, we had a minor child. The child graduated from high school, was 18 years old, back in May of 2013. Nothing between there and 2016. The child went off to ISU and, granted, he was back on the weekends. He spent holidays and summers at Ms. Conour's residence, undisputed. But, and she was working Monday through Friday. She had all of this time to do a job search, obtain employment, second part-time job. She had her reasons stated, and I've set them out in my brief. I'm a sporting mom, but the child graduated from high school, only involved in incidental sports after that. That's 2013. Insufficient time to do it because I had to take care of my land and my house. Well, I dare say that she was doing the same thing from August of 2012 until she was terminated with her job with Mr. Conour in May of 2013. That she was working 40 to 45 hours, taking care of the house, a minor child. Granted, he had his own vehicle and he could travel. But, I don't see any reason that she would have insufficient time. Now, in addition to that, she did nothing. Absolutely zero. What interested me was a statement by the trial judge in awarding maintenance with no deviation from statutory guidelines for imputed income. And he used the word, well, this was the status quo that the parties had during the marriage. I've never seen that in an appellate brief or anywhere. And I also take issue with it. If I'm looking at the status quo, okay, during their marriage she worked part-time. Dispute as to whether he wanted her to work more, but it doesn't really matter. But during the marriage and prior to the separation, they had a minor child. She was still working over 40 hours for that last period of time up to the time they separated. Likewise, the child's 18. Doesn't that change the status quo? Goes off to college, spends the first year at ISU. After that he went to Richland for a year. Mom could have certainly gone out to Richland, but she testified that she never did that. Never contacted them, never did anything with respect to the maintenance or upgrading her job skills or education. Likewise, she limited her job search to receptionist jobs. Oh, why? Because I don't think I'm qualified to do anything but be a receptionist. Now, granted, she was a travel agent. That was in the past, and probably her skills were not upgraded. But she was keeping books for the business, and she had advanced from doing it by hand to computerization. Don't have any reason why she couldn't be a bookkeeper. She was doing it for a significant business. But she didn't look. She also said, I was doing a job search. How was she doing that? Well, she talked to a friend who was the head of a department at ADM and said, well, we don't really have anything open. Didn't apply at ADM. She didn't go out to Caterpillar. She didn't go out to any of these industries. But she had a website with four websites that she was tracking employment. So she stayed, but she brought no records. There was no documentation of anything. And her testimony was two weeks before the hearing in October when she testified. There was a job posted online. It was a skin care place, I don't know, BAPIC or something like that. And I applied, but the job was already filled. It was a full-time job. She said, well, if you're doing an effective job search, and that's posted online, why didn't you find it before the job was filled? The only other job she could remember that she sent an application in was in December 2017. That's not an effective job search. So we think that, my client thinks, I think, that there should have been imputed income. We imputed it for 40 hours at the same hourly rate that she's doing. $11.50 an hour. We're not suggesting that she could earn more than that, but certainly she could earn that because she was. Judge said, no, status quo. Child's gone. Child went to ISU. Child came back to Richland. Spent the last two years at ISU. There was a significant change here. So I don't know what status quo means, but I do know that people have an affirmative obligation to do that. Moving on a little bit because we have six issues that are actually raised. We have the issue of retroactive maintenance. There's an argument I've set out in my brief. Basically, we have stipulated that it would be retroactive to May 2018, but not any earlier. The judge did not retro it any further. I make an argument that this shall support 505, prohibits it from high school graduation or 19, whichever occurs first, provided the child is 18 years old. In addition, there were issues of who was paying expenses and the like. The bottom line is the judge discretionarily did not take it past May. We have it in the argument. It is set out there. We have a lot. There was a lot located next to the former Maryland residence. It was directly adjacent. They bought it at the same time that they did purchase the residence. About 19 years earlier, my client had obtained a decrease. He appealed something, the real estate assessment, and got decreased down to a much lower tax rate. And the tax rate was increased over time, but not significantly. It was still less than $1,000. The lot was appraised by Kevin Miller. Ms. Panhauer testified that she did not believe that the lot was buildable. It was wet, flooded two to three, three, four times a year. My client told the appraiser, it was Kevin Miller, that, yes, it was wet. He offered a talk. Kevin Miller talked to the person who had platted the ground, and he told him that it was wet as well. Kevin Miller testified that, in 2016, he appraised the property for $17,500. Now, Ms. Panhauer said that the acreage was an acre. In fact, Kevin Miller found that it was 1.3 or 4 acres. Likewise, he checked to see if it was in a floodplain. It was not. It was a platted subdivision. And he factored into his appraisal, and I put it in there, somewhere between $5,000 and $10,000 for site preparation, acknowledging that this was a lot that would take more preparation than most of the others. It's argued that this appraisal did not take into account absolutely whether the lot was buildable. No evidence was produced that it was not, other than pure speculation. The judge apparently took Ms. Panhauer's position that the appraised value by the tax assessor's office was correct. We take exception to that. Tax assessor was not called. It's a hearsay statement. It tells you what the tax is and what the assessed value is. We have no idea when they assessed that, what their basis was to do that. Kevin Miller testified that we don't put much faith in that because assessors do this on a different basis than we do. And he also, Judge Alcesero, I think Ms. Panhauer said that because of these things, she thought that this was where it's worth. My argument is she didn't have any knowledge of fair market value. She had knowledge that it flooded. She had knowledge of the condition of the property and what they used it for. But absolutely zero testimony showing any expertise or any knowledge of fair market value. Likewise, Mr. Kahnauer testified. He's the guy that got the assessment lowered. He's just as- What was it lowered to? I don't know. That wasn't really in the record. But it was down around a couple hundred dollars, and I think the assessed value is somewhere around $500 or $700 currently. But it did not go up significantly. Whatever it was lowered to, in terms of the evidence in the record, how would you explain the difference between that and what Miller's market valuation was, which is $17,000? That's one of the major questions that I have, Judge Harris, and that's simply they didn't bring the assessor in. I don't know how the assessor arrived at that. Whether it was simply as some assessments are made, you like to think that they reassessed this property. There's no evidence that they did that or if, when, or if they did it. Or whether this was just a mathematical thing that for the last 19 years we're going to add 3% on to the value of the property. We don't know. It was a hearsay statement. It was a hearsay statement in court. It's hearsay evidence, and nobody was in there to tell us the basis of it. Kevin Miller testified as to how he arrived at his appraisal, comparable to what? Normal type appraisal. He does 400 of them a year. It's a certified appraisal. Now, was his appraisal outdated? Sure. There's some cases in there the judge can look at and say, well, what do the parties say whether there was change in value, improvements? This is a vacant lot. And a lot of the cases you look at, somebody can testify as to the value of the property. They know what the improvements are. They know the condition of this, that, and the other. It's a vacant lot. We don't have that. So we have bare ground out here, and we have no knowledge on behalf of Mrs. Kahnauer as to any fair market value in the neighborhood, anywhere else. She didn't testify that she checked, did the Internet even, drove around, did anything. I based it on that appraisal. Now, Mr. Kahnauer, however, affirmed the fact that he thought the value was $17,500. So basically we say this is an abuse of discretion. We have a professional appraisal. A person with just as much knowledge as Mrs. Kahnauer, I would say, you have to look at her credibility. She testified, number one, let's go back to her job with the eye care facility. I left that job February 2012. In fact, she was there until sometime in 2016. She testified in 2018, but couldn't remember that two years earlier she was working for an eye care facility. She also testified on the income tax issue. This would come up where I'm sure in their brief, I remember in their brief, they said, well, Mrs. Kahnauer said they split those in 2014 or 2015. She was equivocal, and she came back and changed that. Mr. Kahnauer said no, and he was not equivocal. He said she got the refunds in 2014 and 2015. 2016 was to be split, but there was an error in the tax, and I ended up paying it. She didn't contribute. She got the $5,000, and I got $40. So credibility, what's her recollection of facts? Is she believable? That's up to the trial judge. Now apparently on the lot issue, he believed what she was saying because he took her figure by taking issue with that. Questions about that? You're looking at me like you may have a question. No. I don't mean to put words in your mouth. Listening and rapt attention. Ah, thank you. You know, we like the questions. It's a lot more fun in here when you guys question. Well, I have a question. Sure. I think you've given a recitation of the facts from your point of view, and I think that most of them are, or maybe all of them are correct. All this was before the trial court. True. What is it that was wrong? He's imposed no duty upon her to do what the law says, to go out and approve her situation, and she had basically five years to do it. Likewise. He did say she is currently working and continues to look for employment, and he was apparently impressed, not impressed is not the right word, but accepted the fact that she had limited additional job skills because of the passage of time, and it might not have been practical to spend a lot of time at Richland or a career center because it was necessary that she continue to work, even if it was only part-time. Now, you could take afternoon classes. She was free after work to do that. She was also 42 years old when the parties separated in 2012. She had no health issues with the exception of some migraine headaches, which there was no testimony that affected her ability to work. And in five years between 42 and 47, which I think is prime time, when even Ms. Horton acknowledges this was a golden opportunity for her to seek education but couldn't because she didn't have a job. Well, that's not true. She did have a job. As I mistakenly said, she had quit, but she points out the W-2s say otherwise. I would take the W-2s as evidence of her acknowledging it was a golden opportunity, but nothing was done. Why does Mr. Kahnauer have to continue to support somebody? And we would never argue that maintenance was not proper. It was only the amount, and that you have to take into account this inertia that has occurred with respect to employment. She had one job at the eye care center, and shortly after she lost that job, she's got a job at Ruffinant. There's no explanation as to why she couldn't find another part-time job within her job skills, no explanation of any of this other than she just simply didn't do it. And if we have a burden to do this or an obligation under the law, it wasn't done here. And I'm saying that should have been done, and that's why we have the issue of imputed income. I have another minute. I can't go through all of the other issues. If you have questions on my other issues, if you would tell me. We'll ask them on rebuttal. All right, sir. I will end it here since I'm not going to be able to tell you much more. Thank you. Thank you. Ms. Gordon? May it please the Court, Counsel? My name is Kelly Gordon, and I represent Lynette Conower, who is the Appley Cross Appellant. As Mr. Hopp discussed, we've got six issues. I'm going to go through them, talking about the maintenance issue first, followed by the vacant lot, the tax refund, life insurance, and attorney's fees, if we get that far. First, though, just to discuss the standard review for the maintenance issues. The Court knows the standard review in maintenance is abuse of discretion. And like Justice Connick pointed out, the lower court heard all of this evidence. The lower court's discretion should be given the weight that, after hearing it all, he found that the maintenance should be $1,995.49 per month. In order to impute income, there must be one of three things. Voluntarily unemployment, attempting to evade a support obligation, or has unreasonably failed to take advantage of an opportunity. Obviously, the second and third one, Mr. Hopp is not arguing his argument, is with regards to voluntarily unemployment. But when you look at the record in this case, as soon as Ms. Conner believed that there was marital discord, she started looking for work. That was before the parties even separated. She knew that she would have to get some sort of employment. And that's when she got the job at Advanced Eye Care. She then worked at Advanced Eye Care from August of 2012 until February of 2016. And as Mr. Hopp points out, and we pointed out in our brief as well, when Ms. Conner was testifying, she was on the witness stand, nervous, and she got those years wrong. But as we look at the tax returns, we see that she actually worked at Advanced Eye Care from August of 2012 until February of 2016. So she wasn't just laying back waiting for Mr. Conner to pay her maintenance. She went out and she got the job. Mr. Conner then fired her from the family business, and she continued to work at Advanced Eye Care. When things got bad at Advanced Eye Care, she had to quit that job again. She did not run back into court and ask for more maintenance. Instead, what she did is she tried to actually look for a full-time job. She put in applications to a bank and to a veterinary clinic trying to get a full-time job. Unfortunately, she couldn't get a full-time job. But the position at Ruffin opened up, and she was able then to get another part-time job at Ruffinant. She worked in the mornings until noon or 1, and in the afternoons she did have the minor child still at home for part of the pendency of the divorce proceedings. And she took care of him in terms of taking him to where he needed to be, doing domestic duties at the house, which included the 1.27 acres of land, keeping that up as well. And this case is, and I cited my brief, to the case of In re Marriage of Peterson, a support district case from 1992, where in that case the court still ordered maintenance even though the woman had a master's degree. But the appellate court noted, even with a master's degree, she can't capitalize on that. Now, my client doesn't have a master's degree, but I use that to point out she couldn't get a full-time job. As the court pointed out, she's of mature age, that's what the court said, of mature age and limited skills. She is still looking to find a full-time job. Unfortunately, she can't find one. She's on various websites. That's how jobs are seen now by employers. So she's on Indeed, she's on Get Me a Job, and then at least two other ones she testified to. And she looks at those in the afternoon when she gets home from work. Unfortunately, a lot of those are jobs that require different skills than what Ms. Conower has. She lives in Decatur, the Decatur area. A lot of those jobs have to do with they want laborers, they want machinists. She simply does not have those skills. So to argue that she is underemployed, I think she has shown through the history of this case that she has actually been active trying to get a job. There was no requirement from her by the lower court to do a job search, yet she's done that and she continues to do that. As Mr. Hott pointed out, just two weeks before trial, she applied for a full-time job. Unfortunately, she didn't get that. So she has been active in trying to get work. With regards to the retroactivity of the maintenance, it's up to the discretion of the court whether that maintenance is retroactive. There is no dispute as to the length of the maintenance going forward. The argument was we ended up bifurcating the judgment in September, and there was never an agreement that I said it would go back to May of 2018 when the child graduated from college. It was that I wouldn't argue that it should be any time after the bifurcated judgment. What the court did was the court ordered that it be retroactive to the time that the child graduated from college, which would be May of 2018. Again, abuse of discretion, it's up to the court when to start that. The court didn't start it as of the day of the judgment. It did make it retroactive at least to May of 2018. To make it retroactive even further to high school would leave Mrs. Conner at somewhat of a disadvantage in the sense that the temporary order that was entered said that he was supposed to pay $250 per week, and that was titled partial child support is what the temporary order said. Nobody ever went back and modified that after the child graduated from high school. Instead, it just continued on. The child stayed at her house for several years, was there on the weekends during college as well as the summers, and she continued to get the $250. Now, I know it's speculation, but if Mr. Conner would have filed a motion to terminate, then more than likely she would have filed a motion for 513 expenses. So to go back and say that that maintenance should be retroactive all the way back kind of takes away, well, it does take away her right to have filed and gotten additional money for 513 expenses while the child was in college. So we believe that the trial court did not abuse its discretion in making it retroactive to May of 2018. The next issue involves the vacant lot. Like Mr. Hott pointed out, the court used the value that my client opined,  when they purchased the lot over 20 years ago, 21 years ago, they purchased the vacant lot and the lot that the house is on together. The testimony, even from Mr. Conner, was they never intended to build on that vacant lot. Instead, the minor child, when he wasn't a minor, uses that vacant lot for a motocross. So it was never intended to be built on. And in fact, like Mr. Hott pointed out, he went and he, when it was assessed, it was originally assessed for over $6,000 right after they purchased it. And Mr. Conner appealed that with the assessor's office. And the appeal came back and it was $150, and that's found at Exhibit E80 in the record. So it was only $150. And that was based on Mr. Conner knowing at the time, that many years ago, this is not a buildable lot, it's not worth $6,000 at the time. And he did that himself. So going forward, the assessed value then was $597 at the time of trial. And the Department of Transportation versus Harper kind of lines out what you need in order for a litigant to make an opinion on their own real estate. And she had knowledge, knowledge of the land. She's lived there for 21 years. She knows that it's floods. My Exhibit 23, which I also put pictures in my brief, show that if there's a heavy rain, this doesn't look like a vacant lot. It looks like a river. There's kids and inner tubes floating around in it. It's not a buildable lot. The testimony of Kevin Miller, the expert that Mr. Conner used, he valued the land at $17,500. However, on cross-examination, it was pointed out that he actually had no current value for the land. The appraisal was over 2 years old. And upon further questioning and showing him the pictures that we had, Exhibit 23, he said that when he appraised the land, he based it upon an assumption that it was a buildable lot. But whether it was buildable was beyond his expertise. So he couldn't say whether or not you could build on it. After showing him the pictures, he also recognized that it was less than ideal for building a house upon it, even though that's what he appraised it for. And then, like I said, after he looked at the pictures, he testified that he would have to consult, actually, with another expert to determine whether or not the lot would even be buildable. And then he had no appraised value of what it is today. And therefore, the court then used the value that Ms. Conover had, which was the $597, which was the assessed value, but also based upon her knowledge of living there, its potential uses for lack of use, as well as the fact that it flooded so often. So we do not believe that the court abused its discretion in any way in valuing that lot at the $597. The next issue that I'd like to address is the tax refunds. The court credited Ms. Conover with receiving all of the tax refunds for tax year 2014 and 2015. Mr. Ha pointed out in his closing argument that Mr. Conover had acquiesced to her receiving the refunds for those years. There was never an argument made in his closing argument that there should be any sort of credit towards Mrs. Conover on the spreadsheet, ultimately. The court did that sui sponte and added that in. And when the court did that, the court actually miscalculated what those figures were. The closing argument of Mr. Ha was different from what the testimony showed with regards to his client and what happened with the tax refunds of 2014 and 2015. In fact, Mr. Conover testified that, yes, in fact, the tax refund for 2014 and 2015 went to pay the real estate taxes. So we move up one year. So those went to pay the real estate taxes for tax years 2015 and 2016. So Mr. Conover, in his testimony, actually agreed that, yes, in fact, that happened. Where the testimony differs is what happened to the remaining amount. Mrs. Conover testified that they split it. Mr. Conover testified that they didn't split it. But the difference is, so for tax year 2014, the refund was $6,212. This is laid out in my brief as well. The real estate taxes were around $4,300. So the difference was $1,800. We don't know exactly what the real estate taxes were, though, right? Because there was no evidence? No. Actually, in my reply brief, I point out the exact pages. It's in the tax returns. In the tax returns, because you get a deduction for your real estate taxes, it's in the tax returns of each year what the actual real estate taxes are. For those years? Yes. Okay. Yes, yes. And I'm sorry, I don't have those page numbers, but it's in my brief. And in the last brief I filed, I point out the exact pages of those real estate taxes. So we do have that evidence. And even though there is a difference and there's a dispute of what happened to the remaining, my argument, our argument, is still that the court should not have to respond to just taking that $10,512 in credit to her. Mr. Hopp never even asked for that to be a credit. And when you're looking at the whole of the divorce and the assets and the debts, that's included already in there. So even if she, assuming argument, even if she did get that money, it's already included in our spreadsheet of funds. So we don't think that that should have been credited at all. And in my last brief, I have another spreadsheet that shows what the equalization payment, so to speak, would be if we take out that $10,000. Because the court had ordered that the assets and debts be equalized on a 50-50 basis. My next issue is with regards to the life insurance. I had outlined in my closing argument that because of the maintenance that Mr. Conower would be paying Mrs. Conower, the amount of $1,995, that she should, in accordance with Section 504F2, be given the opportunity to secure that maintenance award with life insurance. And I realized, and I said in my brief, that a lot of times that would have been a better issue to raise on a motion to reconsider. However, because of the time that elapsed from the time the judgment was entered and the time Mr. Hopp filed his appeal, it wasn't very many days. And since he had already filed the appeal, we rolled it into this. We request, with regards to the life insurance, because I did ask for it in my closing argument. The judge didn't address it. Presumably that could mean that he denied it. I understand that. But at least for a remand for the trial court to decide whether or not to order that Lynette be given the opportunity to get the life insurance to secure maintenance. My final issue is with regards to the attorney's fees. Section 5-508A provides that the court can award attorney's fees. Again, the standard review in that is abuse of discretion as well. The court did not order it. We do believe that it's abuse of discretion. When you look at the factors, since she was awarded maintenance, when we're looking at 508A, we look at the 503 and the 504 factors as well. She was awarded maintenance. They divided the property 50-50. And even with maintenance, her gross amount per month is still... It will be a little over $3,000 per month. While Mr. Connors' gross per month is going to be a little over $5,300. So about another $2,200 difference in their gross incomes, even after maintenance. So when we analyze all the factors of 504 and 503, and looking at those factors, and he has the better ability to make income and to save money because of that extra $2,000 that he has per month, we would request that she be awarded attorney's fees. And the court did, in fact, abuse its discretion in not awarding attorney's fees. I see no questions. Thank you. Mr. Hoppe? Mr. Hoppe, may I ask you in regards to Ms. Larkin's last argument relating to the 10,512? It appears that there was evidence in the record in regards to the real estate taxes. So can you address that? Why is Ms. Gordon incorrect that the trial court erred in failing to take into account the real estate taxes that were in the record? I don't think there's any indication in the record that the judge didn't. He didn't explain his decision. Well, in her brief, the reply brief at pages 1 and 2, I mean, she shows a calculation that results in a figure of 10,512, the same figure that the trial court used. It's a plausible suggestion on her part that that is, in fact, how the court arrived at that figure, but it does not take into account the real estate taxes for 2014. Am I getting the years right, 2014 and 2015? 14 and 15, they paid the real estate taxes. The balance, according to Mr. Kahnauer, was paid over to her. So how do you address that? How do I address it? The judge had the facts. He ruled upon them. I don't know whether he went back and looked at the tax returns to find that. That was within the affidavit, certainly, as I have in my figure, about $4,500 in real estate taxes, which is the current figure, probably higher than it was back then. So he had all of the figures. How he arrived at what he arrived at, I don't know. I just simply don't know. He didn't explain it in his decision. And whether he looked at that, I don't know either. And I will tell you that I don't think that there is any requirement of an equal division. It has to be equitable, as I understand 503. So how he divided that, I'm not sure, if that answers your question. I simply don't know. But that's a standard argument. When you look at imputing income, voluntary unemployment, there's also that unreasonable failure to take advantage of an opportunity. She had the opportunity to get an education, upgrade job skills. She didn't do it. February 2016, quitting iCare, that's not in the W-2. It's not in the record. It's only in the record as you deal with I quit in February 2013, which she didn't do. She also says she applied for full-time work. I don't know if there's anything in the record that supports that. When she talked about taking the child here, there, and everywhere for his graduation at ISU, we'll remember that there was an order to pay $80 a week to the child for gasoline, and he had his own vehicle through this entire period of time. My client continued to pay that, and it's in the record, until after he obtained employment, after he graduated from ISU, for three weeks after he took that job. So no expense there. The child could certainly, 19, 20, 21, 22, with a vehicle, drive himself around. When we have here, she can't find a job. Well, she's restricted herself to receptionist, GB booking. There are all sorts of other jobs out there. We have the lowest unemployment rate in history. She can't find a job. With respect to the lab, the lab was used as the minor. They hadn't intended on building on it. The minor was no longer a minor. They were no longer together. You sell a lot. She has less to take care of. I don't see any reason not to do that or why it's unreasonable. Certainly, if she wants it, she can keep it, but it ought to be valued fairly. And the argument that this is what they used it for I don't think makes any sense. The question is, was it fairly appraised and determined in value? On life insurance, motion for reconsideration. As I understand, motion is for reconsideration. You don't re-argue what the judge didn't do. You argue whether there's been a change in the law, whether he got the law wrong, and it's a matter of discretion. So what she wanted to do was go back and argue that a motion for reconsideration should have done it. It wasn't done. Is it discretionary? Is there an abuse of discretion for not ordering it? I don't see it. In terms of fees, we argue gross incomes and what have you. Do we take into account the fact the judge ordered this man to pay $55,000 to Ms. Kanawha within 90 days? There's nothing in his affidavit, nothing in the division of property where he's going to come up with that money. Got to borrow it. That's going to be taken out. Thank you. Thank you, counsel. We'll take the matter under advised appraisal.